# CHITTENDEN COUNTY,

[Continued from *ante*, page 88.]

---

## S. S. JACKSON & CO. *v.* EUGENE BISSONETTE.

### *Book Account.    Consignor and Consignee.*

The defendant consigned a quantity of cheese to the plaintiffs, as commission merchants, in Boston, Massachusetts, and they sold a portion of the same on the 12th of September, to Henry Dean & Co., and on the 20th day of said September, the plaintiffs rendered a full account of their dealings with the defendant, and struck a final balance of "net proceeds," deducting commissions, and all other charges, stating "Amount to your credit $801.66, which you can draw for at "sight," adding, "when you write us again, please say if you wish us *to remit* "*to you,* or you draw on us for the amount." After the receipt of this statement the defendant drew upon the plaintiffs, and they paid a large portion of this sum or balance. Dean & Co., before the plaintiffs had collected of them the amount due for the cheese sold to them, became insolvent and went into bankruptcy, but · the plaintiffs did not inform the defendant of the fact of their indebtedness or bankruptcy, until nearly thirty days after their failure. *It was held,* upon these facts, that there was an actual, positive and unqualified assumption by the plain-tiffs, of the sale to Henry Dean & Co., as cash in hand.

It was also *held,* that a payment made under such circumstances, the money is not to be recovered back, except upon the clearest case of fraud, on the part of the defendant, or mistake of facts, by plaintiffs; not the mistake of future contin-gencies, but present, and important facts, forming the basis upon which plaintiffs made the payment.

And it was also *held,* that an express promise of the defendant to refund the money thus paid by the plaintiffs, would be a mere *nudum pactum.*

BOOK ACCOUNT.   The case was recommitted to the auditor, by this court, at a former term, for a more particular statement of facts, who reported, substantially, the following facts:—

The plaintiffs were, during the year 1845, and ever since that time have been, commission merchants in Boston, Massachusetts. That the defendant, during the time aforesaid, resided in Charlotte, Vermont, and was engaged in mercantile business.   That about the 5th day of September, 1845, the defendant consigned to the plaintiffs a quantity of cheese, consisting of fifty-five casks, 11,817

pounds, net weight, and by letter, dated the 5th day of September, 1845, apprised the plaintiffs of said consignment, and in said letter directed the plaintiffs to dispose of said cheese to the best advantage; said letter was received by plaintiffs three days after its date, and said cheese on the 11th day of September, six days after the date of said letter. On the 12th day of said September, the plaintiffs sold and delivered forty-one casks of said cheese to Henry Dean & Co., a firm then doing business in said Boston, at the price of $565,93.

That said sale to said Dean & Co. was what then was and now is termed, by merchants in Boston, a "sale for cash." And in such case, it is the custom for the vendor to wait a reasonable time for the purchaser to examine the goods and bills, and see that all is right, and then to call on the vendee for the cash.

That one of the plaintiffs called on Dean & Co. several times before the 20th of September, and was put off by excuses, one of which was, that there was error in the *tare;* on said 20th of September one of the plaintiffs rectified all mistakes with said Dean & Co., and requested them to pay for said cheese; they said it was not convenient to make payment on that day. That subsequently, and between the 20th of September and the 7th of October, one of the plaintiffs called twice on Dean & Co. for payment, and was told the last time of calling, that they need not be to the trouble of calling again, as they would soon bring the money to plaintiffs, which they never did; and that on or about the 20th day of September, said Henry Dean & Co. in fact failed, and after that time did not pay any debts in full, and on the 6th day of October next afterwards, said Dean & Co. went into bankruptcy under the insolvent laws of Massachusetts. That the failure of said Dean & Co. was not generally known in Boston until the 7th or 8th of October, and the plaintiffs first knew it on the 7th, at night.

That the plaintiffs, on the 20th day of September, 1845, made out a statement of their dealings with the defendant, and sent the same with a letter to the defendant. That part of the letter referred to, is as follows:—

"BOSTON, Sept. 20, 1845.

"MR. E. BISSONETTE,

"DEAR SIR: Annexed please find account, sales of fifty-five "casks of cheese.  *  *  *  *  *  *  *  *  *  *

" The balance your due, is eight hundred and one dollars and six-
" ty-six cents, which you can draw for at sight, and when you
" write us again, please say if you wish us to remit to you, or you
" draw on us for the amount.   *   *   *   *   *   *   *
" Very Respectfully, yours, &c.,

(Signed)   " S. S. JACKSON & Co."

That when said forty-one casks of cheese were sold and deliv-
ered to said Dean & Co., said Dean & Co. were made debtor to
the defendant therefor on the books of the plaintiffs, and the entry
so remains upon said books.   The plaintiffs first informed the de-
fendant of the failure of said Dean & Co., by letter dated the 3d,
and mailed the 4th day of November, 1845, at Boston.   The de-
fendant, on the 12th and 13th days of November, was at Boston,
and there had a conversation with the plaintiffs about proving the
claim of defendant against said Dean & Co. under the bankrupt
proceedings, the defendant not being a resident of Massachusetts ;
upon which one of the plaintiffs consulted an attorney, and was
advised that unless proved, the debt would be barred and lost.
Whereupon the defendant directed the plaintiffs to do with his said
debt, as they would do with their own,— to do the best they could
with it.

That on the 7th day of October, 1845, said Dean & Co. were
suffered to overdraw, at the North Bank, in Boston, their account
to the amount of $2,500.

It also appeared, that at the time of the sale of said cheese to
said Dean & Co., the defendant did not know of the existence of
the custom in Boston, in relation to " sales for cash," but had
been informed that such custom existed among merchants, in the
city of New York.

There are other facts reported by the auditor, but sufficiently
appear in the opinion of the court.

*E. J. Phelps* and *L. E. Chittenden* for plaintiffs.

1. The sale made by plaintiffs was in conformity with their in-
structions.   The cheese having been consigned to them as factors,
under general instructions to dispose of it " *to the best advantage,*"
not restricting them to a sale for cash only, they were justified in
selling either for cash or on a reasonable credit, provided they fol-
lowed the general usage of the market, and used ordinary care

and prudence. *Goodenow* v. *Tyler,* 7 Mass. 36. *Clark* v. *Van Northwick,* 1 Pick. 343. *Dwight* v. *Whiting,* 15 Pick. 179. *Mc-Kinstry* v. *Pearsall,* 3 Johns. 318. *Van Allen* v. *Vanderpool,* 6 Johns. 69. *Leverick* v. *Miegs,* 1 Cow. 645. 2 Kent's Com. 622.

Nor is it material whether the sale was, in a legal sense, a sale for cash, or upon credit. Either would have been strictly within their instructions and their duty.

The only importance of the evidence as to the usage, is to show that this sale was in conformity with the general usage of merchants, which the law requires. Especially as that usage affords the measure of the diligence required.

2. The sale was made with all reasonable care and prudence, and the plaintiffs were guilty of no negligence in conducting it, or in attempting to collect the proceeds.

3. Neither the plaintiffs letters, nor the payment by them of defendant's draft, can be treated as an assumption of Dean & Co.'s debt. To amount to such an assumption by the factors, it must clearly appear that it was their intention to make the debt their own. 1 Am. Lead. Ca. 483 and cases cited. *Winchester* v. *Hockley,* 1 U. S. Cond. 416. *Robertson* v. *Livingston,* 5 Cow. 473.

The payment of the draft amounts to nothing, in the absence of any intention to assume the debt. Such payments are continually made in the ordinary course of business, and may always be recovered back if a loss comes without fault on the part of the factor. *Dwight* v. *Whitney,* 15 Pick. 179. *Corliss* v. *Cummings,* 6 Cow. 437.

*S. Wires* and *W. W. Peck* for defendant.

1. The plaintiffs are chargeable with the debt of Dean & Co., on the ground of not exercising due care to collect it.

2. They represented to defendant that the price was paid, and authorized him to draw accordingly. He did so, and they must be treated to have assumed the debt. *Consequa* v. *Fanning,* 3 J. R. 587. *Oakley* v. *Crenshaw,* 4 Cow. 250.

The opinion of the court was delivered by

REDFIELD, J. This was an action of book account, and was recommitted to the auditor by this court at a former term, for a more particular statement of facts. The case now stands upon

the last report, which the auditor says is intended to embrace all the facts in the case.

The case was heard at the present term, upon the question of law arising upon the report and upon a motion to recommit, for the report of further facts in relation to the plaintiffs having as-. sumed the debt of Dean & Co., at their own risk, as cash in hand. The decision of the court will be more briefly stated upon both points at the same time.

The case upon the report, was decided mainly upon the plaintiffs having assumed the debt of Dean & Co., by the letter of the 20th of September, 1845, their subsequent indulgence to Dean & Co., and especially, by the actual payment of a large portion of the balance. The important facts bearing upon this point in the case, are that this was confessedly a cash sale. . The defendant had no knowledge of any custom among commission merchants in Boston, to make delivery of goods in such cases, before the actual payment of the money, although he had learned some such custom in New York. The sale was made on the 12th of September. Three days after, the plaintiffs called upon Dean & Co. for the money, thus showing that the plaintiffs considered it their right to require it at that time. But they were put off by sundry shallow subterfuges, until the 20th of September, when all evasions being removed, all parties regarded the money as due, the amount being definitely ascertained. At this time the plaintiffs render a full account of their dealings with defendant, and strike a final balance of "Net Proceeds," deducting commissions and all other charges, stating *"Amount to your credit* $801,66," *"which you can draw for* AT SIGHT," adding, "when you write us again, please say if you wish us to *remit to you*, or you draw on us for the amount." ·

It certainly requires some degree of sagacity, and refinement of criticism, to conjecture any ground of doubt of this being an actual, positive and unqualified assumption of the sale to "Henry Dean & Co." "$513,88," as cash in hand. It so appears upon the account rendered. From anything which appears upon the account rendered, or the correspondence, the cash had actually been realized upon this, as much as upon any other portion of the account.

This sale to Dean & Co. consisted of six different casks of cheese, with distinctive marks upon each to indicate the persons of

whom the several casks were received by defendant, as is obvious from the marks themselves, which are carried into the plaintiffs' account rendered to defendant, and obviously for the purpose of enabling him to give an account of them, to those of whom he received them, whether upon commission or otherwise. Thus showing very clearly that the plaintiffs understood that the effect of this account, rendered by them, would be to induce the defendant to make *his* final settlement with *his customers* or *consignors,* for the several casks, showing in the most unequivocal manner, that they at the time regarded it as a final assumption of the debt of Dean & Co. *as cash in hand.* Indeed any other view of the subject, seems to us, little short of absurdity. So much so, that we can scarcely conceive how the plaintiffs ever conceived sufficient effrontery to claim to have it treated in any other light. Such a claim, seriously put forth in any metropolis of trade, could only have exposed the claimant to ridicule or contempt. And the plaintiffs very likely, at home, would have pocketed the loss in silence, out of self-respect. For it seems they could not summon sufficient courage to make any demand upon the defendant until about thirty days after Dean & Co. had notoriously gone into bankruptcy.

And this view of the subject is confirmed by all the subsequent conduct of the plaintiffs. They paid the defendant's drafts drawn upon them by their own direction, to the amount of nearly $800, on the 22d of Sept. and the 7th of October. They continued to call upon the firm of Dean & Co., and suffered themselves to be put off, from time to time, by such pitiful evasions, as sinking men are fain to resort to, until Dean & Co., went into bankruptcy on the 7th or 8th of October, without giving the slightest intimation to defendant of the delay, which is certainly grossly negligent and altogether unaccountable, if they all the time considered the debt under the control of the defendant, and themselves merely agents for its collection. And of the same character is the additional fact that they gave no intimation of the failure of Dean & Co. to the defendant, till nearly a month after the event, on the 3d day of November, which was probably upon the receipt of an additional draft, when the sense of suffering, in paying the balance of the loss, drove them to the desperate resort of protesting the debt which they had, besure, voluntarily assumed, nearly two months before. And when the parties meet in Boston, a few days subse-

quent to this time, the plaintiffs make no claim, as we learn, to have the money, which they had paid upon the drafts, refunded; each seemed to stand mutely upon his own reserved rights then, whatever that might be, in the final event. Under this complication of facts, all tending to show the unqualified assumption of the debt of Dean & Co., and the actual payment of a considerable portion of it by plaintiffs, we cannot regard these payments as creating any debt on the part of the defendant. It was clearly regarded at the time, by both parties, as the payment of a debt by the plaintiffs. And in such case the money is not to be recovered back, except upon the clearest case of fraud on the part of defendant, or mistake of facts by plaintiffs; not the mistake of future contingencies, but present and important facts, forming the basis upon which the plaintiffs made the payment. Nothing of this is pretended.

Upon a question of this kind, which is a good deal matter of intention, and the facts being in writing, or conceded, become matter of law, very little aid can be expected from reported cases, unless there is a very close correspondence in the facts. Each case, in its facts, will be peculiar; it is the leading principle which is to govern all cases. But the case of *Oakley* v. *Crenshaw,* 4 Cowen 250, is very similar to the present, and certainly not more clearly indicating an intention to assume the risk of the collection. There the factor said, the money is not all received, but "I am desirous not to have the account stand open, therefore you may draw for the net balance." And the court here regarded it as an absolute assumption of the debt, which could not be repudiated upon the after failure of the debtor. If money paid over under such circumstances could be recovered back, nothing could ever be settled, as is said in *Consequa* v. *Fanning,* 3 Johns. Ch. 587. In *Robertson* v. *Livingston,* 5 Cowen 473, the note of the factor is made payable after the debt to the principal would fall due, thus showing an *intention* to have one debt meet the other. It is said in Smith's Mercantile Law, p. 106, "If indeed the factor, after the sale, remit his own note or acceptance to the principal, for the amount of the proceeds, he will be liable on that, whether employed under a *del credre* commission or not, and whether the vendee be or be not solvent. For, by giving such an instrument, he lulls all the suspicions of his employer, and causes him to dismiss all care

XXIV.        40

about the solvency of the purchaser." Citing *Lefever* v. *Lloyd*, 5 Taunton 749. *Simpson* v. *Swan*, 3 Camp. 291. *Goupy* v. *Harden*, 7 Taunton 159. That is precisely the present case, except that here most of the money has been actually paid over. Now to the extent of the actual payment, there is not, in the present case, the remotest ground of belief that either party, at the time of payment, had the remotest apprehension that in any event it could ever be reckoned an advance, or in any manner formed a debt on the part of defendant. The case of *Dwight* v. *Whitney*, 15 Pick. 179, has no proper bearing upon the present case. It merely shows that carrying the sale into the account, to the credit of the consignor, does not necessarily fix the factor with the payment of the apparent balance of the book. The true rule upon this subject is, as it seems to me, laid down very briefly and very pertinently, in *Shaw* v. *Picton*, 4 B. & C. 715. 10 E. C. L. R. 443, in the language of BAYLY, J, "It is quite clear that if an agent (employed to receive money, and bound by his duty to his principal, from time to time, to communicate to him whether the money is received or not,) renders an account from time to time, which contains a statement that the money is received, he is bound by that account unless he can show that statement was made unintentionally, and by mistake. If he cannot show that, he is not at liberty afterwards to say that the money had not been received and never will be received, and to claim reimbursement in respect of those sums for which he had previously given credit. I think that when an agent has deliberately and intentionally communicated to a principal that the money due to him has been received, he makes the communication at his peril, and is not at liberty afterwards to recover the money back again."

This view of the case settles the matter of the plaintiffs right to recover back money, which he has paid towards an acknowledged balance in his hands, on account of sales of property consigned to him. For the whole balance claimed, is of this character. How far the defendant is entitled to recover the remainder, we have not felt disposed to strain the matter very severely. The report being drawn up, with a view chiefly to present the plaintiffs claim to recover the balance claimed by him, and the contingency of defendants being entitled to recover a balance, not apparently being much upon the mind of the triers of the fact, there is nothing in

the report to show that the defendant is or is not in any different circumstances from what he would have been, by reason of the plaintiffs having acknowledged this balance in their hands, the plaintiffs promise to pay the balance must still be regarded as a mere naked promise of payment, without consideration, which is revocable until performed. It is quite probable, facts exist from which it might be made to appear that he had dealt differently with his customers, in consequence of this balance being acknowledged in plaintiffs' hands, and before he was informed such was not the fact, and if so, he would be entitled to recover the balance. But the litigation has been so long protracted, that we have not deemed it expedient to recommit the report, upon this point.

In regard to recommitting the report, to find how far the defendant has acknowledged his obligation to refund the money claimed by the plaintiffs, it would be useless, as we should regard an express promise to refund this money, as a mere *nude pact.* And, as this point has been urged with some degree of zeal, we may be allowed to say, that to our minds, it is altogether incomprehensible how any one can view the conduct of the plaintiffs, in the whole transaction, as falling short of the most culpable and gross negligence, in making or in not making these collections, long before the failure of Dean & Co., when from the mere fact of that firm, on the very last day of doing business, being permitted to overdraw their bank account $2500, it is obvious that any reasonable degree of pertinacity on the part of the plaintiffs towards Dean & Co., (half as much as they now exhibit towards defendant,) would have secured the payment of this balance by Dean & Co.

The motion to recommit is overruled and judgment on the report for defendant to recover his costs.